IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 07-00411-04-CR-W-HFS |
| CHRISTOPHER TAYLOR, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO DISMISS COUNT II OF THE INDICTMENT
FOR PRE-INDICTMENT DELAY**

Before the court is defendant's motion to dismiss count II of the indictment -- possession of cocaine -- on the ground that the cocaine was found in his car on January 6, 2006, but he was not indicted until December 2007, 23 months later. Defendant argues that the delay was prejudicial to defendant's defense because in the interim, police destroyed the in-car videotape of the inventory search of defendant's car. "If the tape still existed, it would conclusively demonstrate that the inventory search was invalid because of the officers' numerous violations of KCPD's standardized inventory procedures." I find that defendant has failed to satisfy his burden of establishing (1) actual and substantial prejudice because of the pre-indictment delay, and (2) that the government deliberately delayed in order to gain a tactical advantage. Therefore, defendant's motion to dismiss count II for pre-indictment delay should be denied.

## I. BACKGROUND

On December 6, 2007, an indictment was returned charging defendant with conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

On July 7, 2008, defendant filed a motion to dismiss count II for pre-indictment delay (document numbers 91 and 92) arguing that the delay resulted in his inability to prove an invalid search of his car because of the destruction of the videotape of the stop. On August 20, 2008, the government filed a response (document number 110) arguing that the search of defendant's car was lawful and pointing out that defendant has not offered evidence that the police acted in bad faith in destroying the videotape or that the tape had any apparent exculpatory value.

On September 16, 2008, I held an evidentiary hearing on this motion and defendant's motion to suppress based on an invalid inventory search. The government appeared by Assistant United States Attorney Catherine Connelly. The defendant was present, represented by Charles Eblen and Robert Warren. The following witnesses testified:

1. Detective Eric Greenwell, Kansas City, Missouri, Police Department ("KCMOPD");

2. Detective Tiffany Gillespie, KCMOPD;

2

3.  Captain Robin Houston, KCMOPD; and

4.  Christopher Taylor.

In addition, the following exhibits were marked and admitted into evidence:

P. Ex. 1   KCMOPD policy and procedure on towing and protective custody of vehicles and contents

P. Ex. 2   KCMOPD procedural instruction for detaining and questioning persons under arrest

P. Ex. 3   Police report of January 6, 2006, stop

P. Ex. 4   Tow-in report dated January 6, 2006

P. Ex. 5   Request to hold/save videotape form

P. Ex. 6   Patrol video hold release

P. Ex. 7   Record of municipal offenses as of January 6, 2006

P. Ex. 8   KCMOPD property inventory list

D. Ex. 1   KCMOPD arrest report form

D. Ex. 2   KCMOPD tow report

D. Ex. 3   KCMOPD continuation report

D. Ex. 4   KCMOPD policy and instructions for towing/protective custody of vehicles and contents

D. Ex. 5   KCMOPD police and instructions for detaining and questioning persons/arrest/search and seizure

D. Ex. 6   Proof of car insurance for Christopher Taylor

D. Ex. 7   Kansas Department of Revenue Motor Vehicle Report

D. Ex. 8   Notice of dismissal of traffic violation

D. Ex. 10  A-R: Photographs

D. Ex. 11  KCMOPD Request to hold/save videotape form

3

    D. Ex. 12 KCMOPD policy and instructions for in-car video camera procedures

    D. Ex. 13 KCMOPD patrol bureau memorandum for mandatory holding of in-car video

## *II. EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. Kansas City, Missouri Police Department Sergeant Eric Greenwell was the leader of a surveillance team working with the Drug Enforcement Agency on a wiretap case involving Valencia and Marvin Locket (Tr. at 6). As leader, Sergeant Greenwell was notified when calls came into the wire room suggesting there may be movement that could be surveilled (Tr. at 7, 18). When Sergeant Greenwell received such information, he developed a strategy and implemented a plan with the rest of the team (Tr. at 7).

2. On January 6, 2006, Sergeant Greenwell received information from Task Force Officer Bill Smith that the team had intercepted a call that Valencia and Marvin Locket were involved in a drug transaction and that they believed the subject was defendant (Tr. at 6, 7-8, 21). The transaction was to take place at 1810 East 68th Street (Tr. at 8, 11, 21-22).

3. Sergeant Greenwell went to 7239 Tracy, a location that their information indicated Valencia Locket may be (Tr. at 8). At approximately 3:00 p.m., they located Marvin Locket's vehicle

4

at the Tracy address (Tr. at 8). Sergeant Greenwell surveilled the vehicle and eventually followed it to 1810 East 68th Street (Tr. at 8). Valencia Locket exited the vehicle and entered the residence (Tr. at 9).

    4.    Sergeant Greenwell continued to maintain surveillance on 1810 East 68th Street; he was positioned six or seven houses away (Tr. at 9, 18). A 1993 green Chevrolet 1500 truck stopped at the residence, and Sergeant Greenwell observed defendant exit the vehicle and go into the residence (Tr. at 9, 10). Defendant did not have anything in his hands (Tr. at 10). When defendant exited the residence and reentered the truck, he had a white bag in his hands (Tr. at 10). The bag was later determined to contain cocaine (Tr. at 20).

    5.    Sergeant Greenwell requested that a patrol officer conduct a traffic stop based on the suspicion of drugs being located in the truck (Tr. at 11, 12). Sergeant Greenwell told the officers about the possible drug transaction and instructed them to look for a traffic violation so that they could perform a stop (Tr. at 13, 14, 23).

    6.    Kansas City, Missouri Police Detective Tiffany Gillespie[1] was a patrol officer on January 6, 2006 (Tr. at 25-26). As part of her training, Detective Gillespie was instructed

---

[1] On January 6, 2006, Detective Gillespie's last name was Davis (Tr. at 47).

5

on the Kansas City, Missouri Police Department's policies on towing and protective custody of vehicles and contents and detaining and questioning persons under arrest (Tr. at 26-27).

7. Detective Gillespie and her partner, Officer Stokes,[2] responded to Sergeant Greenwell's request for a traffic stop on January 6, 2006 (Tr. at 27-28, 67). She testified that Sergeant Greenwell informed them that the driver of a green 1500 Chevrolet was seen in a narcotics transaction and that the narcotics were believed to be in the vehicle (Tr. at 28-29, 82).

8. Detective Gillespie observed defendant fail to use his turn signal when turning onto Bannister Road from I-435 (Tr. at 29, 50; P. Ex. 3; D. Ex. 1). She also observed defendant change lanes without signaling (Tr. at 29, 65; P. Ex. 3; D. Ex. 1). As a result, Detective Gillespie activated the lights and sirens on her patrol car and stopped defendant near Bannister and I-435 (Tr. at 13, 30, 66; P. Ex. 3; D. Ex. 1).

9. When Detective Gillespie activated the lights and sirens, the video camera in the patrol car was activated (Tr. at 35, 66).

10. Detective Gillespie exited the patrol car and approached defendant; Officer Stokes approached the passenger's side of the vehicle (Tr. at 30, 67; P. Ex. 3). Defendant was the only individual in the truck (Tr. at 31). Detective Gillespie

---

[2]Officer Stokes's last name is now Renti (Tr. at 67).

identified herself and informed defendant he had been stopped for failing to use his turn signal when changing lanes and turning onto Bannister Road (Tr. at 31-32, 69; P. Ex. 3).

11. Detective Gillespie asked defendant for his driver's license and insurance (Tr. at 32). Defendant produced a valid Kansas driver's license and an expired insurance card (Tr. at 32, 69; D. Ex. 7).

12. A computer check revealed defendant did not have any outstanding warrants (Tr. at 32, 71).

13. Detective Gillespie testified it is illegal for an individual to drive in the State of Missouri without insurance (Tr. at 33). Accordingly, defendant was issued citations for failing to use his turn signal when changing lanes and for not having a valid insurance card (Tr. at 33; P. Ex. 3).

14. Upon receiving the citation, defendant informed Detective Gillespie that he had valid insurance although he was unable to provide it to her (Tr. at 34). Detective Gillespie did not recall if defendant reached into the glove box (Tr. at 34, 53-54). Defendant later produced a valid insurance card and the charge was dropped (D. Ex. 6).

15. Defendant was ultimately arrested and taken into custody for the traffic violations (Tr. at 31, 34, 79; P. Ex. 3). Detective Gillespie testified she normally would not take an

7

individual into custody for these types of traffic violations (Tr. at 73).

16. After being arrested, defendant was transported away from the scene (Tr. at 74). Defendant was not given the option to (a) release his vehicle to another driver, (b) provide authorization to waive leaving his vehicle at the scene, or (c) drive his vehicle to the Metro Patrol Division (Tr. at 79). He was not afforded these options because Detective Gillespie believed the vehicle had been used in a crime involving narcotics (Tr. at 80).

17. An inventory search was conducted prior to defendant's truck being towed (Tr. at 31, 35). Detective Gillespie testified the search was conducted in compliance with Kansas City, Missouri Police Department policy (Tr. at 36, 40, 76). She specifically relied on the Department's Policy on Towing/Protective Custody of Vehicles and Contents, Section A, which states "A vehicle will be towed when the vehicle is known to have or believed to have been used in the commission of a crime as evidentiary value," to justify the inventory search (Tr. at 36-37; P. Ex. 1; D. Ex. 4). Based on the information given to her by Sergeant Greenwell, Detective Gillespie believed defendant's truck had been involved in the trafficking of narcotics (Tr. at 37-38). Detective Gillespie also relied on the Kansas City, Missouri Police Department Policy on Detaining and Questioning Persons - Arrest,

8

Search and Seizure, Annex D, Paragraph 2, which states, "When officers have probable cause to believe a vehicle which is readily movable, contains articles which are entitled to be seized and for which a warrant can be obtained, i.e., contraband, the entire vehicle may be searched for such articles without obtaining a search warrant" (Tr. at 39-40; P. Ex. 2; P. Ex. 5).

    18. The inventory search was performed because defendant had been arrested and taken from the scene, and also because Detective Gillespie had information that the truck contained contraband (Tr. at 78).

    19. At the time defendant was stopped, Detective Gillespie had conducted hundreds of traffic stops (Tr. at 39, 48). She followed this procedure in each one (Tr. at 39). Detective Gillespie testified that of the hundred of traffic stops, more than ten resulted in arrest (Tr. at 48).

    20. Detective Gillespie performed a search of defendant's truck (Tr. at 40). The search revealed, <u>inter</u> <u>alia</u>, approximately 74 grams of a white powdery substance in a clear plastic bag (Tr. at 41; P. Ex. 3; D. Ex. 1). She also found tools, clothing, toiletries, and paper inside the truck (Tr. at 41; P. Ex. 8).

    21. Kansas City Police Department policy requires officers to write reports following traffic stops (Tr. at 49, 51; P. Ex. 2; D. Ex. 5). The policy mandates that officers include any and

9

all facts that support reasonable suspicion and probable cause (Tr. at 51, 64, 77, 80; P. Ex. 2).

22. Detective Gillespie prepared a report of defendant's traffic violations and arrest (Tr. at 54; P. Ex. 3; D. Ex. 1).

23. Detective Gillespie testified the probable cause supporting the traffic stop was defendant's failure to use his turn signal and failure to provide proof of insurance (Tr. at 53). She did not know why she did not reference her knowledge that drugs were in the truck as probable cause supporting the inventory search (Tr. at 81-82).

24. Shortly after the search was completed, Detective Gillespie also completed a tow-in report (Tr. at 41, 55; D. Ex. 2; P. Ex. 4).

25. Kansas City, Missouri Police Department policy requires that the contents of a search be listed in detail and that the officer provide reasons for the search (Tr. at 42, 53). In addition, the Kansas City, Missouri Police Department policy on Towing/Protective Custody of Vehicles and Contents, Page B-3, Paragraph D-2 provides, officer should itemize large quantities of valuable tools (Tr. at 60-62; P. Ex. 1; D. Ex. 4).

26. Detective Gillespie did not itemize or list the value of the numerous tools located in defendant's truck but, rather, listed "miscellaneous tools" in the tow-in report (Doc. No. 42, 55-56; P. Ex. 4; D. Ex. 2). She testified she did so because

10

there were so many tools and she did not believe she could accurately identify each one (Tr. at 42). Detective Gillespie believed that since she could not be accurate with regard to the tools she should just summarize (Tr. at 43). She stated she also did so to protect the owner of the items as well as the Kansas City Police Department (Tr. at 43).

27. Detective Gillespie testified that it could not be determined how many tools defendant had in his truck based on the description in her tow-in report (Tr. at 57-58).

28. Defendant testified he had hundreds of tools and four toolboxes in his truck when he was stopped (Tr. at 110-111, 115; D. Ex. 10C-10R). He did not contend that any of his tools were missing as a result of the January 6, 2006, traffic stop and subsequent search (Tr. at 114).

29. The video camera in Detective Gillespie's patrol car captured her approaching defendant's truck, returning to the patrol car, running a computer check, returning to defendant's truck and placing him under arrest, conducting the inventory search, as well as defendant's demeanor throughout the incident (Tr. at 35-36, 68). The video would have shown if defendant had reached into the glove box (Tr. at 54). Because Detective Gillespie was wearing a microphone, the videotape would have also any contained dialog with defendant (Tr. at 68-69).

11

30.  Detective Gillespie requested that the videotape of the incident be retained for evidentiary value (Tr. at 43, 44; P. Ex. 5; D. Ex. 11).  This request was consistent with Kansas City, Missouri Police Department policy (Tr. at 43; D. Ex. 12; D. Ex. 134).

31.  The Kansas City, Missouri Police Department policy on Department Owned Video Cameras and Tapes and In-Car Video Camera Procedures requires that videotapes be retained for one year (Tr. at 87, 99-100; D. Ex. 12).  When a hold/save request form is completed by an officer, the videotape is assigned a number and the hold/save request is wrapped around the videotape (Tr. at 87-88).  The videotape is then taken to the patrol video section where it is stored for one year (Tr. at 87, 88, 89).  After the first year, the video is sent to the specific unit within the Department to ascertain whether the videotape can be destroyed (Tr. at 87, 89).

32.  Robin Houston was the sergeant over the Administrative Squad in the Drug Enforcement Unit in January of 2006 and for at least a year thereafter[3] (Tr. at 86, 88).  In this position, she was responsible for reviewing the video hold release requests and property disposals that went to the Drug Enforcement Unit and

---

[3]She is currently a Captain within the Kansas City, Missouri Police Department and will therefore be referred to as "Captain Houston" in this Report and Recommendation.

12

deciding whether to keep holding the video or to release it (Tr. at 86-87, 89, 92-93). Upon receiving a request, Captain Houston checks the database to see if the videotape is associated with an active case (Tr. at 93). She does not normally reach out to the federal investigatory bodies to learn if they have an open case unless there is information they are involved; it is not Kansas City, Missouri Police Department Policy to contact all agencies (Tr. at 95-96, 103).

33. The videotape of the traffic stop on January 6, 2006, involving defendant was assigned an identification number of 9848 (Tr. at 45, 90).

34. On February 9, 2009, Captain Houston received a patrol video hold or release request regarding videotape number 9848 (Tr. at 91; P. Ex. 6). The form stated the video was being held for the Drug Enforcement Unit, and did not reference the DEA or defendant being a career criminal (Tr. at 92-93, 97; P. Ex. 6). Captain Houston checked the Drug Enforcement Unit's database and the database did not show there was an active case (Tr. at 93-94). She ran defendant's name through the ALERT System, which shows whether there are pending cases against individuals, and did not find any active charges with regard to the February 9, 2009, incident (Tr. at 94-95, 97). Captain Houston did not check with the Career Criminal Unit (Tr. at 95).

13

35.  Captain Houston ordered that the videotape be destroyed (Tr. at 98; P. Ex. 6).  Captain Houston testified the destruction of the videotape was consistent with Kansas City, Missouri Police Department video processing policies (Tr. at 98). At the time she ordered the destruction, she did not know there was an active DEA case (Tr. at 97-98).  Furthermore, she had never heard of Marvin and Valencia Locket (Tr. at 104).  Captain Houston testified that had she know of the ongoing investigation, the videotape would not have been destroyed (Tr. at 98, 104).

36.  Captain Houston testified more information on the hold/save request form may have helped ensure the videotape was preserved (Tr. at 102).  She further testified the Kansas City Police Department could do a better job of training its officers to use more specific information on the hold requests (Tr. at 102).  She also stated the Department is changing to paperless reporting which will help making more information accessible on the computer (Tr. at 102).

## II.  *PRE-INDICTMENT DELAY*

In order to establish a due process violation sufficient to warrant dismissal for pre-indictment delay, a defendant must show both that the government deliberately delayed in order to gain a tactical advantage and that the delay resulted in actual and substantial prejudice to the defendant. United States v. Gladney, 474 F.3d 1027, 1030 (8th Cir. 2007); United States v. Haskell,

14

468 F.3d 1064, 1070 (8th Cir. 2006). To block prosecution on the basis of pre-indictment delay, a defendant must show an actual, non-speculative prejudice resulting from the delay. Once this showing is made, the due process inquiry requires that the court consider the reasons for the delay as well as the prejudice to the accused. United States v. Gladney, 474 F.3d at 1030-1031; United States v. Sturdy, 207 F.3d 448, 452 (8th Cir. 2000). A defendant is entitled to dismissal of an indictment when he shows actual prejudice to his defense from an unreasonable delay on the part of the government. United States v. Lovasco, 431 U.S. 783, 788-789 (1977); United States v. Purham, 725 F.2d 450, 453 (8th Cir. 1984); United States v. Taylor, 603 F.2d 732, 735 (8th Cir.), cert. denied, 444 U.S. 982 (1979). Where actual prejudice is established, the reasons for the delay are balanced against the prejudice shown by the accused. United States v. Lovasco, 431 U.S. at 790; Bennett v. Lockhart, 39 F.3d 848, 851 (8th Cir.), cert. denied, 514 U.S. 1018 (1994); United States v. Bartlett, 794 F.2d 1285, 1289-90 (8th Cir.), cert. denied, 749 U.S. 934 (1986).

Defendant bears the burden of proving actual prejudice. United States v. Lovasco, 431 U.S. at 789; United States v. Jackson, 446 F.3d 847, 851 (8th Cir. 2006); United States v. Brockman, 183 F.3d 891, 895 (8th Cir. 1999).

15

In this case, defendant argues that he was prejudiced because, through the normal procedure at the time within the Kansas City, Missouri, Police Department, the dash cam videotape of the stop on January 6, 2006, was destroyed, and the videotape would have shown "the officers' repeated violations of KCPD procedures". This argument is without merit. Defendant's motion to suppress the evidence seized pursuant to an inventory search of his vehicle has been addressed by me and I have recommended that it be denied as meritless. Defendant's car was lawfully stopped; defendant had an opportunity to provide proof of insurance and he provided an expired insurance card. The police officer who made the arrest testified at the hearing that she did not remember whether defendant asked to look through his glove compartment for the current insurance card. Even if he had, there is no proof that the current insurance card was in his glove compartment. Additionally, defendant has offered no authority for the proposition that once a driver breaks the law by failing to provide proof of insurance on demand he is entitled to more chances to comply with the officer's request.

The testimony presented at the hearing makes it clear that there is no evidence that defendant was prohibited from looking for his insurance card:

> A. I believe he said that he has it in his glove box or with him but he wasn't able to provide it for me or to me.

16

Q. Did you ask him to provide it for you?

        A. Yes. And he . . . was not able to, no.

        Q. Did you see him reach into the glove box to get it?

        A. I don't recall him reaching into the glove box while I was standing there. He may have. But still was not able to produce a valid insurance card for me.

        Q. So, nonetheless, even though he said he had it, he wasn't able to provide it?

        A. Yes. That's true.

(Tr. at 34).

        Q. Now, you did, in fact, search the vehicle, correct?

        A. Yes, I did.

                          * * * * *

        Q. Now, among the papers that you found there, do you recall finding anything that's -- did you find any valid insurance?

        A. No. No, ma'am, I didn't.

(Tr. at 40, 42).

        Q. You testified at some point that you don't recall one way or another whether Mr. Taylor tried to get in the glove box, right?

        A. Yes.

        Q. You don't know one way or the other if he tried to get in the glove box to give you proof of insurance?

        A. If he would have said -- if he said he had proof of insurance in his glove box, then I would have definitely allowed him to get in his glove box and --

17

>                Q.   Did you see him do that?
>
>                A.   I don't recall seeing him do it, no.
>
> (Tr. at 53-54).

In addition, defendant testified during the hearing but never testified that he tried to get his current insurance information but was not allowed to. Therefore, there is no evidence at all contradicting the testimony quoted above.

Finally, defendant was taken into custody for failing to use his turn signal, in addition to failing to provide proof of insurance (Tr. at 50-51, 53). Therefore, the fact that he either was or was not allowed to look in his glove compartment for his current insurance card is irrelevant.

### *III. CONCLUSION*

I find that defendant has failed to satisfy his burden of establishing (1) actual and substantial prejudice because of the pre-indictment delay, and (2) that the government deliberately delayed in order to gain a tactical advantage. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to dismiss count II of the indictment on the ground of pre-indictment delay.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days to file and serve specific objections.

                                         /s/ Robert E. Larsen
                                        ROBERT E. LARSEN
                                        United States Magistrate Judge

Kansas City, Missouri
February 27, 2009